## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

SHERRY STRICKLAND, individually and on behalf of others similarly situated,

    *Plaintiff*,

v.

MPX INSURANCE SERVICES, INC.,

    *Defendant*.

Case No. 9:23-cv-81305-AMC

### DEFENDANT MPX INSURANCE SERVICES, INC.'S
### MOTION TO COMPEL ARBITRATION

The Court should grant this Motion to Compel Arbitration filed by Defendant MPX Insurance Services, Inc. ("MPX") in response to the Complaint filed by Plaintiff Sherry Strickland ("Plaintiff").

In her class action Complaint, Plaintiff alleges that she received unsolicited telemarketing calls in violation of Telephone Consumer Protection Act ("TCPA") and the Florida Telephone Solicitation Act ("FTSA"). But Plaintiff only received calls made on behalf of MPX because she visited a website for consumers interested in obtaining insurance quotes and (a) submitted her contact information, including a telephone number; (b) consented to being contacted; (c) agreed to the Terms and Conditions, which include mandatory arbitration and are set forth, in full, on that website; and (d) clicked the "Get My Quote" button.

The Complaint is squarely within the scope of the arbitration agreement and class action waiver and extends to third-party beneficiaries including MPX. Therefore, Plaintiff's claims must be resolved by arbitration and may not be brought as a class action.

## I. BACKGROUND

Lead Economy, LLC ("Lead Economy") is a lead generator for insurance companies and helps connect interested consumers who seek insurance products with providers of such products. (*See* Declaration of Jared Conaway (attached as Exhibit 1) at ¶ 3). As part of its business, Lead Economy operates www.foreverhomeinsurance.com (hereafter, "the Website"), a website for consumers interested in obtaining insurance quotes. (*Id*. ¶ 4). To receive insurance quotes, a consumer must perform the following actions on the Website: (a) submit his or her contact information, including a telephone number; (b) consent to being contacted; (c) agree to the Terms and Conditions, which include mandatory arbitration and are set forth, in full, on the Website; and (d) click the "Get My Quote" button. (*Id*. ¶ 5).

On June 24, 2023, at 12:02 a.m. EDT, Plaintiff visited the Website and entered her contact information, as follows:

| | |
|---|---|
| Name: | Sherry Strickland |
| Address: | 121 SE Hubble Street |
| City: | Lake City |
| State: | Florida |
| Zip: | 32025 |
| Email: | strick4@comcast.net |
| Phone: | (386) 288-3632 |

(*Id*. ¶ 6 (hereafter, "Plaintiff's lead")).

### *The Consent Language and Marketing Partners Disclosure*

Plaintiff then clicked the "Get My Quote" button on the Website and agreed to the following:

> By clicking Get My Quote and submitting this form, I provide an electronic signature and express written consent to receive marketing communications for insurance products & services via automatic telephone dialing system, including calls, SMS/MMS, pre-recorded calls or artificial voice messages from foreverhomeinsurance.com and its marketing partners. Message and data rates may apply. I understand I may opt-out of phone and SMS communication by replying

> 'STOP' or 'HELP' for more info, or by contacting contact@foreverhomeinsurance.com. I understand I will receive marketing communications to the phone number provided, which includes wireless numbers, and if applicable, numbers previously registered on the Federal and State DNC registries. I certify that I am a US resident over 18, and all information submitted with this request is true and accurate to the best of my knowledge. Consent is not a condition to purchase products or services and if I do not consent, I can call (888) 845-9747 to speak to a professional to obtain an insurance quote. I acknowledge my consent can be revoked at any time. I understand and agree to the Terms and Conditions including mandatory arbitration.

(*Id*. ¶ 7 (hyperlinks removed)).[1] The phrase "marketing partners" in the above consent language was a hyperlink that identified marketing partners including Apollo Group, Apollo Insurance Group, and Apollo Interactive, Inc. (*Id*. ¶ 8). The phrase "Terms and Conditions" in the above consent language was a hyperlink to the full Terms and Conditions agreed to by Plaintiff. (*Id*. ¶ 9).

### *The Terms and Conditions*

The Terms and Conditions provide, in pertinent part:

> If you have any dispute concerning any aspect of these Terms of Website Use, the Website, or any of our services, **you agree to submit your dispute for resolution by arbitration before the American Arbitration Association** ('AAA') in the county where you live by filing a Demand for Arbitration. The arbitrator will have exclusive authority to resolve any dispute including any claim that all or any part of these Terms of Website Use are unenforceable. Opt-Out of Arbitration/Class Action Waiver. The Terms & Conditions do not constitute a waiver of any of your rights and remedies to pursue a claim individually and not as a class action in binding arbitration as provided above. **This provision preventing you from bringing, joining or participating in class action lawsuits is an independent agreement**.

(*Id*. ¶ 10 (emphasis added)).

The Terms and Conditions further provide:

---

[1] Plaintiff's click on the "Get My Quote" button constitutes an "electronic signature" under the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001, *et seq*., as it is an "electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." 15 U.S.C. § 7006(5).

> You may opt-out of these Dispute Resolution Provisions by providing written notice of your decision within thirty (30) days of the date that you first register on the ForeverHomeInsurance Website. **This arbitration agreement includes claims related to our clients, vendors, and Marketing Partners, which are third party beneficiaries of this arbitration agreement**.

(*Id*. ¶ 11 (emphasis added)).[2] In addition, the Terms and Conditions provide:

> YOU ACKNOWLEDGE AND AGREE THAT, VIA YOUR ACCEPTANCE OF THESE DISPUTE RESOLUTION PROVISIONS, YOU WAIVE ANY RIGHT TO A JURY TRIAL, AS WELL AS YOUR RIGHT TO BRING, JOIN OR PARTICIPATE AS A PLAINTIFF OR A CLASS MEMBER IN A CLASS ACTION SUIT OR MULTI-PARTY ARBITRATION BROUGHT AGAINST US, ANY PERSON RELATED TO US OR A SERVICE PROVIDER USED BY US TO PROVIDE THE SERVICE.

(*Id*. ¶ 12 (capitalization in original)).

The consent language, marketing partners disclosure, and Terms and Conditions were all present on the Website on June 24, 2023. (*Id*. ¶ 13). When Plaintiff clicked the "Get My Quote" button, she expressly acknowledged that she had read the Terms and Conditions and agreed to be bound by them, including the agreement to arbitrate and the class action waiver. (*Id*. ¶ 14).

Lead Economy only received Plaintiff's lead because she visited the Website and (a) submitted her contact information, including a telephone number; (b) consented to being contacted; (c) agreed to the Terms and Conditions, including mandatory arbitration, which are provided, in full, on the Website; and (d) clicked the "Get My Quote" button. (*Id*. ¶ 15).

Pursuant to an agreement between Lead Economy and its marketing partner, Apollo Interactive, Inc. ("Apollo"), on June 24, 2023, Apollo purchased Plaintiff's lead. (*Id*. ¶ 16). Pursuant to another agreement, Apollo then sold Plaintiff's lead to GetAQuote.com, LLC ("GetAQuote") on June 24, 2023. (*See* Declaration of Marcio Pepe (attached as Exhibit 2) at ¶ 8). The agreement required all leads Apollo sold to GetAQuote.com to be obtained from persons who

---

[2] Plaintiff did not submit a notice opting out of the Terms and Conditions' arbitration provision.

provided their prior express written consent to receive marketing calls, as required by the TCPA and other laws and regulations. (*Id.* ¶ 7).

Pursuant to an oral agreement between GetAQuote.com and MPX, GetAQuote.com called Plaintiff on MPX's behalf on June 26 and June 27, 2023.[3] (*Id.* ¶ 9). Plaintiff alleged that she received calls for insurance quotes on June 26 and June 27, 2023. (*See* ECF No. 1 ¶ 21). Those alleged calls arise from Plaintiff's provision of consent, through the Website, to receive such calls. (Ex. 1 ¶ 17). As such, Plaintiff's suit involves a dispute concerning the Terms and Conditions, the Website, or Lead Economy's services. (*Id.* ¶ 18). Therefore, Plaintiff's claims must be resolved by arbitration, and may not be brought as a class action. (*Id.* ¶ 19).

## II.   LEGAL STANDARDS

Under the standard set by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*. ("FAA"), the Court should compel arbitration. The FAA reflects the "liberal federal policy favoring arbitration" and instructs that arbitration agreements "shall be valid, irrevocable, and enforceable." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Consistent with that policy, "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). The Supreme Court has underscored the point by instructing that the FAA "leaves no place for the exercise of discretion . . . , but instead mandates that district courts *shall* direct the parties to proceed to arbitration" when their contract so provides. *Dean Witter Reynolds*, 470 U.S. at 218 (emphasis in original).

"Accordingly, the FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is

---

[3] On August 1, 2023, MPX sold all its assets and ceased doing business. (Ex. 2 ¶ 4).

5

enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Indus.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (citing 9 U.S.C. §§ 2–4). Where an enforceable arbitration agreement exists, the "FAA creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." *Lambert*, 544 F.3d at 1197.

This District treats a motion to compel arbitration like a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, under which no presumption of truthfulness attaches to the Plaintiff's allegations and the Court weighs the evidence submitted, including materials outside of the pleadings. *See Vulpis v. Credit Acceptance Corp.*, No. 16-cv-61200-KMW, 2016 U.S. Dist. LEXIS 194269, at *4 (S.D. Fla. Sept. 21, 2016) (granting motion to compel arbitration); *see also* Fed. R. Civ. P. 12(b)(1). If necessary, the Court may order limited discovery on the issue of arbitrability and decide the issue via a motion for summary judgment or at a trial. *See Bradshaw Constr. Corp. v. Underwriters of Lloyd's*, 108 F. Supp. 3d 1287, 1291 (S.D. Fla. 2015); *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016); 9 U.S.C. § 4.[4]

### III. ARGUMENT

As argued below, the Court should compel arbitration without assessing the arbitration agreement's validity or scope, and leave all other issues raised herein to be decided by the arbitrator. However, even if the Court chooses to decide the issue of arbitrability in the first instance, it should compel arbitration pursuant to the Terms and Conditions for three reasons: a valid written agreement to arbitrate exists, an arbitrable issue exists, and MPX has not waived the right to arbitrate.

---

[4] If arbitration is not compelled, MPX reserves its rights to file a motion challenging Plaintiff's claim under Federal Rule of Civil Procedure 12 and otherwise respond to the Complaint. MPX also reserves its right to compel arbitration of the claims of any putative class members.

### A.     The arbitrator should decide the gateway issue of arbitrability.

As an initial matter, the Supreme Court has explained that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). Such agreements are referred to as "delegation provisions." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017).

Where "an arbitration agreement contains a delegation provision . . . the courts only retain jurisdiction to review a challenge to that specific provision." *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015). "Only if [a court] determine[s] that the delegation clause is itself invalid or unenforceable may [it] review the enforceability of the arbitration agreement as a whole." *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 (11th Cir. 2016). "When parties clearly and unmistakably defer the issue of arbitrability to the arbitrator . . . the court should compel arbitration without assessing the arbitration agreement's validity or scope." *Wright v. Greensky, Inc.*, No. 20-cv-62441, 2021 U.S. Dist. LEXIS 110593, at *45 (S.D. Fla. June 14, 2021) (citing *Steffanie A. v. Gold Club Tampa, Inc.*, No. 8:19-cv-3097, 2020 U.S. Dist. LEXIS 20269, at *6 (M.D. Fla. Feb. 6, 2020)). Indeed, this Court has held that "incorporation of the AAA Rules shows 'clear and unmistakable evidence' that the parties intended for an *arbitrator* to decide questions of arbitrability." *Lehr v. Cryo-Cell Int'l, Inc.*, No. 23-cv-80405-AMC-BER, 2023 WL 6534512, at *4 (S.D. Fla. Oct. 10, 2023) (Cannon, J.) (emphasis in original) (quoting *Spirit Airlines, Inc. v. Maizes*, 899 F.3d 1230, 1233 (11th Cir. 2018)) (collecting cases).

Here, the arbitration clause applies to "any dispute concerning any aspect of these Terms of Website Use" or "the Website" itself. (Ex. 1 ¶ 10). Any such dispute must be "submit[ted] . . . for resolution by arbitration before the . . . AAA," wherein "[t]he arbitrator will have exclusive

authority to resolve any dispute including any claim that all or any part of these Terms of Website Use are unenforceable." *Id*. This broad delegation clause makes it clear that any dispute surrounding the Terms and Conditions, including arbitrability, should be decided in arbitration. This is further evidenced by the arbitration clause's explicit requirement of resolution by arbitration before the AAA, necessarily incorporating the AAA's rules. Because the Terms and Conditions incorporate the AAA's rules, "the arbitrator should decide whether the arbitration clause [applies]." *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) (quoting *Terminix Int'l Co. L.P. v. Palmer Ranch L.P.*, 432 F.3d 1327, 1332 (11th Cir. 2005)), *cited by Lehr,* 2023 WL 6566478, at *4 (Cannon, J.).

As such, the Court "should compel arbitration without assessing the arbitration agreement's validity or scope," and leave all other issues raised herein to be decided by the arbitrator. *Steffanie A.*, 2020 U.S. Dist. LEXIS 20269, at *6.

**B.       Even if this Court determined arbitrability, arbitration should be compelled.**

Even if this Court were to decide the arbitrability of the underlying TCPA and FTSA claims, the result would be the same; *i.e.,* the Court should compel arbitration pursuant to the arbitration clause within the Terms and Conditions. Arbitration should be compelled for three reasons: (1) a valid written agreement to arbitrate exists (and applies to Plaintiff and third-party beneficiaries of the agreement, including MPX); (2) an arbitrable issue exists; and (3) MPX has not waived the right to arbitrate. *See Dye v. Tamko Bldg. Prods., Inc.*, 275 F. Supp. 3d 1314, 1317 (M.D. Fla. 2017), *aff'd*, 908 F.3d 675 (11th Cir. 2018).

**1.       Plaintiff agreed to a valid written agreement to arbitrate.**

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985). "The threshold determination of whether an arbitration agreement exists

8

at all is 'simply a matter of contract.'" *Wright*, 2021 U.S. Dist. LEXIS 110593, at *22 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

State law generally governs whether an enforceable agreement to arbitrate exists. *Bazemore*, 827 F.3d at 1329. Here, the Terms and Conditions state that "[Plaintiff] agree[s] that any legal action brought against us shall be governed by the laws of the State of Delaware, without regard to conflict of law principles." (Ex. 1 at Ex. D (screenshot of Terms and Conditions)). Therefore, Delaware law governs the enforceability of the arbitration agreement. For all internet agreements construed under Delaware law, the key issues are whether the user (a) "had reasonable notice, either actual or constructive, of the terms of the . . . agreement;" and (b) whether the user "manifest[ed] assent to those terms." *Newell Rubbermaid, Inc. v. Storm*, No. 9398-VCN, 2014 Del. Ch. LEXIS 45, at *18 (Del. Ch. Mar. 27, 2014).

For the following reasons, the Court should conclude that the Terms and Condition provided Plaintiff with reasonable notice of the arbitration agreement and, under Delaware law, Plaintiff manifested assent.

### a. Plaintiff had reasonable notice of the Terms and Conditions.

Plaintiff visited the Website and (a) submitted her contact information, including a telephone number; (b) consented to being contacted; (c) agreed to the Terms and Conditions, which include mandatory arbitration and are set forth, in full, on the Website; and (d) clicked the "Get My Quote" button. (Ex. 1 ¶ 15). The Website displayed the Terms and Conditions in the form of a clickwrap agreement.[5] (*Id.* at 2 n.1). "Clickwrap agreements are routinely recognized by courts and are enforceable under Delaware law." *Doe v. Massage Envy Franchising, LLC*, 2020 Del.

---

[5] By contrast, browsewrap agreements do not require the user to affirmatively click a button; rather, users assent to website terms and conditions merely by using the website. *Newell,* 2014 Del. Ch. LEXIS 45, at *2 n.1.

9

Super. LEXIS 3019, at *7 (Del. Super. Ct. Dec. 21, 2021). This includes agreements where the terms and conditions are available via hyperlink. *Id*., at *8.

It is indisputable that Plaintiff had notice of the Terms and Conditions because she entered into a clickwrap agreement, which advised, "[b]y clicking Get My Quote and submitting this form," Plaintiff "understand[s] and agree[s] to the Terms and Conditions including mandatory arbitration." (Ex. 1 at Ex. D). The Terms and Conditions were underlined and readily available to Plaintiff, through a hyperlink, for her convenient reference, which Delaware law deems sufficient for notice purposes. *See*, *e.g.*, *Newell*, 2014 Del. Ch. LEXIS 45, at *19–20 (finding that terms and conditions made available to a consumer via hyperlink prior to the consumer clicking "accept" were "clear terms that would place a user on actual notice that she was assenting to an agreement"); *Geraci v. Uber Techs., Inc.*, No. N21C-07-151 CLS, 2021 Del. Super. LEXIS 642, at *4–5 (Del. Super. Ct. Oct. 29, 2021) ("Plaintiff entered into a valid and enforceable arbitration agreement" by "agree[ing] to the terms of . . . [a] clickwrap agreement" by clicking "'YES, I AGREE' to the terms of the agreement").

The hyperlink to the Terms and Conditions was "conspicuous." *Doe*, 2020 Del. Super. LEXIS 3019, at *8. The consent disclosure containing the hyperlink to the Terms and Conditions was located in close proximity to the "Get My Quote" button. The hyperlink "was underlined and in a different color font," *id*., making it stand out from the rest of the text. In addition, the Terms and Conditions themselves were "in normal-sized font, preceded by clear titles, and were easily ascertainable." *Newell*, 2014 Del. Ch. LEXIS 45, at *20 n.45; *see also* (Ex. 1 ¶ 7; Ex. 1 at Ex. A (screenshot of consent language displayed on Website)).[6]

---

[6] Plaintiff's "[f]ailure to read or recall agreeing to the [Terms and Conditions] will not keep this case out of arbitration." *Doe*, 2020 Del. Super. LEXIS 3019, at *10; *see also Garcia v. Harmony Healthcare, LLC*, No. 8:20-cv-1065, 2021 U.S. Dist. LEXIS 78975, at *10 (M.D. Fla. Apr. 26,

The consent language specifically put Plaintiff on notice that the Terms and Conditions required binding arbitration by stating, "I understand and agree to the Terms and Conditions including mandatory arbitration." (Ex. 1 at Ex. D). Thus, Plaintiff was "immediately put on notice of the arbitration provision" before even clicking on the hyperlink to the Terms and Conditions. *Doe*, 2020 Del. Super. LEXIS 3019, at *9.

Thus, the Court should find that Plaintiff had reasonable notice of the arbitration clause in the Terms and Conditions.

### b. Plaintiff provided her assent to the Terms and Conditions.

Mutual assent can be evidenced through the "acts or conduct" of the parties. *Finestrauss v. Woloshin, Lynch, Natalie & Gagne, P.A.*, 2010 Del. C.P. LEXIS 34, at *9 (C.P. July 2, 2010). In the context of a clickwrap agreement, mutual assent can be evidenced by a webpage user "clicking an 'accept' button in order to proceed." *Newell*, 2014 Del. Ch. LEXIS 45, at *2; *see also id.*, at *1 n.1 (citing *Van Tassell v. United Mktg. Gp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)).

Here, Plaintiff visited the Website and (a) submitted her contact information, including a telephone number; (b) consented to being contacted; (c) agreed to the Terms and Conditions, including mandatory arbitration, which are provided, in full, on the Website; and (d) clicked the "Get My Quote" button. (Ex. 1 ¶ 15). By doing so, Plaintiff clearly assented to the arbitration clause. *See Doe*, 2020 Del. Super. LEXIS 3019, at *9 ("Had Plaintiff clicked on the hyperlink and opened the document, she would have been immediately put on notice of the arbitration provision . . . [and] would have been aware that she was altering her rights if she had investigated what she was assenting to.").

---

2021) ("general denials based on a lack of memory will not rebut a signed written agreement"). As such, any argument by Plaintiff that she did not read or recall this agreement is irrelevant to this Court's inquiry.

Because Plaintiff had actual or constructive notice of the Website's Terms and Conditions, and manifested assent to those Terms and Conditions by submitting her request to receive calls for insurance quotes, she is bound by the arbitration clause.

### 2. The Website's arbitration clause governs Plaintiff's TCPA and FTSA claims by its plain text.

The second issue is whether the arbitration clause governs Plaintiff's TCPA and FTSA claims. It does. The arbitration clause applies to "any dispute concerning any aspect of these [Terms and Conditions], the Website, or any of our services." (Ex. 1 ¶ 10). The Terms and Conditions require that Plaintiff may not bring a class action lawsuit, and that "[t]he arbitrator will have exclusive authority to resolve any dispute." (*Id.*). MPX expressly advised Plaintiff that the arbitration agreement applies to all "claims related to [its] clients, vendors, and Marketing Partners, which are third party beneficiaries of this arbitration agreement." (*Id.* ¶ 11).

GetAQuote.com only called Plaintiff on MPX's behalf because Plaintiff requested insurance quotes through the Website. Plaintiff's use of the Website was thus the but-for cause of her alleged receipt of calls. Accordingly, Plaintiff's TCPA and FTSA claims arise from her use of the Website.

Similarly, the parties' dispute regarding whether Plaintiff consented to receive the alleged calls at issue relate to her use of the Website. MPX argues that the Website's consent mechanism was effective, while Plaintiff argues that she did not consent to receive the calls at issue. (*See* ECF No. 1 ¶ 47). But the very fact that this dispute relates to Plaintiff's use of the Website triggers the application of the arbitration clause in the Terms and Conditions.

To the extent that Plaintiff claims she did not visit the Website and agree to the Terms and Conditions, the Court should nevertheless conclude that Plaintiff's claims are subject to arbitration. This Court applies a standard of review similar to a motion for summary judgment specifically to

the question of whether the parties agreed to arbitrate. *See In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (describing an order compelling arbitration issued by a district court in the Southern District of Florida as "summary-judgment-like" because it is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate") (citation omitted); *see also Lopez v. Auto Wax of S. Fla., Inc.*, No. 20-cv-81892-RAR, 2021 U.S. Dist. LEXIS 47211, at *4–5 (S.D. Fla. Mar. 2, 2021) ("[t]he Eleventh Circuit has held that a summary judgment-like standard is appropriate when the making of an arbitration agreement is in question") (internal quotations omitted). Under this standard, to avoid being compelled to arbitrate, Plaintiff "must unequivocally deny that an agreement to arbitrate was reached, and must offer some evidence to substantiate the denial." *Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008).

A dispute is not "'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "This court has consistently held that conclusory allegations without specific supporting facts have no probative value for a party resisting summary judgment." *Bazemore*, 827 F.3d at 1333; *Reddick v. Hewlett-Packard Co.*, No. 1:20-cv-04597, 2021 U.S. Dist. LEXIS 212897, at *15 (N.D. Ga. May 20, 2021) ("Under the summary judgment-like standard that governs, in the face of competent evidence, Plaintiff—as the nonmoving party—may not resist compulsory arbitration solely on the basis of conclusory allegations without specific supporting facts that have no probative value") (internal quotations omitted).

MPX has demonstrated that Plaintiff only received calls regarding insurance quotes because she visited the Website and (a) submitted her contact information, including a telephone

number; (b) consented to being contacted; (c) agreed to the Terms and Conditions, including mandatory arbitration, which are provided, in full, on the Website; and (d) clicked the "Get My Quote" button. (Ex. 1 ¶ 15).[7] Therefore, any dispute surrounding the Terms and Conditions, including arbitrability, should be decided in arbitration.

### 3. MPX has not waived its right to arbitration.

An organization may waive its right to arbitration by either expressly waiving that right, actively participating in litigation as to an arbitrable claim, or otherwise acting inconsistently with its right to arbitration. *Specialty Dx Holdings v. Lab. Corp. of Am. Holdings*, 2020 Del. Super. LEXIS 2723, at *6 (Del. Super. Ct. July 27, 2020). MPX has not expressly waived its right to arbitration. It has not actively participated in any litigation as to this arbitrable claim and has not otherwise acted inconsistently with its right to arbitration. In addition, MPX has not filed any responsive pleading and this Motion is its first response to the Complaint. Consequently, the Court should find that MPX has not waived its right to arbitration.

### 4. MPX is a third-party beneficiary to the Terms and Conditions and is entitled to enforce the arbitration agreement.

MPX is a third-party beneficiary to, rather than a signatory of, the arbitration agreement. Whether a non-signatory to an arbitration agreement may enforce the agreement against a signatory, such as Plaintiff, is a question of state law. *Lawson v. Life of S. Ins. Co.*, 648 F.3d 1166, 1170–71 (11th Cir. 2011). Thus, whether MPX can enforce the arbitration clause is properly examined under Delaware law.

As an initial matter, "Delaware's public policy favors arbitration, and contractual

---

[7] Plaintiff's entries in, and actions taken on, the Website have been confirmed by Lead Intelligence, Inc. d/b/a Jornaya, a third-party company widely recognized as the industry standard for TCPA compliance. Jornaya provides technology to marketers to verify and prove they obtained consent. (*See* Ex. 1 ¶ 7 n.1; Ex. 1 at Ex. C (Jornaya Report)).

arbitration clauses are generally interpreted broadly such that [a]ny doubt as to arbitrability is to be resolved in favor of arbitration." *Kuroda v. SPJS Holdings, L.L.C.*, No. 4030-CC, 2010 Del. Ch. LEXIS 232, at *8 (Del. Ch. Nov. 30, 2010) (internal quotations omitted); *see also Coronado Coal II, LLC v. Blackhawk Land & Res., LLC*, 293 A.3d 372, slip op. at *3 (Del. 2023) ("A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by courts").

Under Delaware law, a "non-signatory to a contract cannot be bound by an arbitration clause unless 'traditional principles of contract and agency law' equitably confer upon that party signatory status with regard to the underlying agreement." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001)). This includes "a third-party beneficiary theory." *NAMA Holdings, LLC,* 922 A.2d at 430. "A third-party beneficiary is 'an individual who is not a party to a contract [but] can nevertheless enforce it under certain circumstances.'" *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022) (quoting 13 *Williston on Contracts* § 37:1 (4th ed.)); *see also Triple C Railcar Serv. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993) ("[A] third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his benefit."). "A third-party beneficiary's rights are measured by the terms of the contract." *NAMA Holdings, LLC*, 922 A.2d at 431. Thus, "where [a] contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that [one of the signatories] is bound." *Id*. (citing 13 *Williston on Contracts* § 37.24).

Here, the Terms and Conditions apply to MPX because they "include[] claims related to [Lead Economy's] clients, vendors, and Marketing Partners, which are third party beneficiaries of

this arbitration agreement" and "ANY PERSON RELATED TO US OR A SERVICE PROVIDER USED BY US TO PROVIDE THE SERVICE." (Ex. 1 ¶¶ 11–12 (capitalization in original)). MPX is an intended third-party beneficiary of the agreement whose rights are "measured by the terms of the contract" notwithstanding the fact that MPX did not sign the contract. *NAMA Holdings, LLC*, 922 A.2d at 431. As a result, MPX is entitled to enforce the arbitration clause of the Terms and Conditions.

Plaintiff alleged that she received calls for insurance quotes on June 26 and June 27, 2023. (*See* ECF No. 1 ¶ 21). Those alleged calls arise from Plaintiff's express consent, through the Website, to receive such calls. (Ex. 1 ¶ 17). As such, Plaintiff's suit involves a dispute concerning the Terms and Conditions, the Website, or Lead Economy's services. (*Id.* ¶ 18). Therefore, Plaintiff's claims must be resolved by arbitration rather than a class action in this Court. (*Id.* ¶ 19).

## IV.   CONCLUSION

Because the arbitration clause at issue provides that the gateway issue of arbitrability must be decided by the arbitrator, the Court should compel arbitration to permit the arbitrator to decide that issue. Even if the Court were to decide arbitrability, the result would be the same because: (1) Plaintiff entered into a binding arbitration agreement; (2) which governs Plaintiff's TCPA and FTSA claims; and (3) MPX is entitled to arbitration as a third-party beneficiary of the agreement. MPX therefore respectfully requests that the Court grant this Motion, issue an order compelling arbitration, and dismiss this case (or, in the alternative, stay this case pending arbitration).

### Certification of Good Faith Conference

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for MPX conferred with all parties or non-parties who may be affected by the relief sought in this Motion but were unable to resolve those issues.

Dated: November 20, 2023                             Respectfully submitted,

| | |
|---|---|
| **COPILEVITZ, LAM & RANEY, P.C.**<br>310 West 20th Street, Suite 300<br>Kansas City, Missouri 64108<br>Tel.:   (816) 472-9000<br>Fax:   (816) 472-5000<br><br>By: */s/ Kellie Mitchell Bubeck*<br>William E. Raney*<br>Kellie Mitchell Bubeck*<br>Colin Gregory*<br>Email: braney@clrkc.com<br>           kbubeck@clrkc.com<br>           cgregory@clrkc.com | **STUMPHAUZER KOLAYA**<br>**NADLER & SLOMAN, PLLC**<br>One Biscayne Tower<br>2 South Biscayne Boulevard, Suite 1600<br>Miami, Florida 33131<br>Tel.:   (305) 614-1415<br>Fax:   (305) 614-1425<br><br>By: */s/ Amy M. Bowers*<br>Timothy A. Kolaya (Fla. Bar No. 56140)<br>Amy M. Bowers (Fla. Bar No. 105755)<br>Email: tkolaya@sknlaw.com<br>           abowers@sknlaw.com |

*Admitted pro hac vice*

Co-Counsel for Defendant MPX Insurance Services, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 20, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Amy M. Bowers*
Amy M. Bowers